# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
### ATLANTA DIVISION

| | | |
|---|---|---|
| **MANHATTAN CONSTRUCTION COMPANY,** | : | |
| | : | |
| **Plaintiff,** | : | |
| | : | **CIVIL ACTION FILE NO.** |
| **v.** | : | **1:09-CV-1917-WSD-AJB** |
| | : | |
| **CECIL M. PHILLIPS; BRADEN COPELAND; PLACE PROPERTIES, LP; PLACE COLLEGIATE PROPERTIES COMPANY; PLACE PROPERTIES DEVELOPMENT SERVICES, LLC; PLACE MANAGEMENT GROUP, LLC; PLACE ENTERPRISES, LLC; and WEBROOMZ, LLC,** | : : : : : : : : : : | |
| | : | |
| **Defendants.** | : | |

## O R D E R

The District Court referred the following discovery motions to the undersigned

for resolution, [Doc. 479]: (1) Manhattan Construction Company's ("Manhattan")

motion to compel discovery from various Defendants, [Doc. 243]; (2) Manhattan's

motion to compel discovery from Place Collegiate Development, LLC ("PCD"),

[Doc. 252]; (3) Manhattan's "second" motion to compel discovery from various

Defendants, [Doc. 266];[1] and (4) Manhattan's motion to compel deposition testimony from Defendant Place Properties, LP ("PPLP"), [Doc. 312].

The Court held a hearing on December 29, 2010 ("December 2010 hearing"), [Doc. 491 (hereinafter "T__")], during which the Court directed the parties to file clarifying pleadings as to some of the discovery disputes. That directive generated the following filings and motions: (5) Defendants' report regarding financial statements, [Doc. 482]; (6) Manhattan's first memorandum in further support of its motion to compel deposition testimony, [Doc. 483]; (7) Manhattan's second memorandum in support of its motion to compel deposition testimony, [Doc. 484]; (8) Defendants' report regarding pledge of certificate of deposit, [Doc. 485]; (9) Defendants' report regarding financial statements, [Doc. 486]; (10) Defendant PPLP's response to Manhattan's second memorandum in further support of its motion to compel deposition testimony, [Doc. 488]; (11) Manhattan's motion to strike Defendants' report regarding pledge of certificate of deposit, [Doc. 489]; (12) Manhattan's motion to strike as untimely Defendant PPLP's response to Plaintiff's memorandum, [Doc. 490]; (13) Defendants' response to Manhattan's motion to strike Defendants' report

---

[1] As Defendants noted at the December 2010 hearing, T15, chronologically this is actually the third motion to compel.

AO 72A
(Rev.8/8
2)

regarding pledge of certificate of deposit, [Doc. 492]; (14) PPLP's response to Manhattan's motion to strike as untimely PPLP's response to Manhattan's second memorandum, [Doc. 493]; and (15) Manhattan's reply in support of its motion to strike Defendants' report regarding pledge of certificate of deposit, [Doc. 494].

For the reasons below, the Court **GRANTS IN PART AND DENIES IN PART** Plaintiff's first motion to compel, [Doc. 243], **DENIES** Plaintiff's motion to compel discovery from PCD, [Doc. 252], **GRANTS IN PART AND DENIES IN PART** Plaintiff's "second" (actually third) motion to compel, [Doc. 266], and **GRANTS IN PART AND DENIES IN PART** Plaintiff's motion to compel deposition testimony, [Doc. 312]. Further, the Court **DENIES** Plaintiff's two motions to strike. [Docs. 490, 492].

## I.      Motions to Compel

As found by the District Court, this case arises out of an almost 8-million-dollar arbitration award that Plaintiff obtained against PCD on January 15, 2008, in the Superior Court of Fulton County. According to Plaintiff's Complaint in this action, non-party PCD and Defendant Cecil M. Phillips ("Phillips") had agreed, pursuant to a development agreement, to construct student-housing buildings and related improvements on the Kennesaw State University campus in Kennesaw, Georgia.

AO 72A
(Rev.8/8
2)

Plaintiff was selected by PCD and Phillips as the general contractor for a phase of this development project and was hired to perform construction work under a contract dated July 22, 2003. Plaintiff filed suit against PCD, claiming it owed payments to Plaintiff under the construction contract. The litigation resulted in Plaintiff obtaining the arbitration award against PCD in the Fulton County Superior Court action. PCD did not satisfy the arbitration award, and Plaintiff filed this action on July 16, 2009, asserting against all Defendants a single claim for piercing the corporate veil.[2] Plaintiff contends all of the Defendants are liable for the arbitration award because they and PCD ignored their corporate formalities and allowed PCD to evade the judgment owed to Plaintiff through various unspecified fraudulent and preferential transfers. [*See* Doc. 198 at 1-3].

This case has generated multiple discovery disputes. In February 2010, at one of the conferences held by the District Court, Plaintiff was granted discovery of certain financial records of Defendants from June 1, 2004, to December 31, 2006. [Doc. 68 at 30]. The District Court held that

> if you find information that would indicate that there was a diversion of funds, then you can come back and I will enlarge it for the people that it

---

[2] On May 18, 2010, Plaintiff filed an amended complaint, [Doc. 208], adding a claim for fraudulent transfer, [*id.* at 22].

4

looks like or the entities that it looks like might have been involved in wrongful conduct.

[*Id.* at 22].

After the discovery motions (listed as (1) through (4) above) were filed, the District Court directed the parties to file executive summaries of the matters in dispute as to those motions. [Docs. 319, 320]. The parties argued at the hearing from those summaries, which the Court addresses below.

### A.      Discovery and Motion to Compel Standards

Rule 26(b)(1) of the Federal Rules of Civil Procedure states that

> Parties may obtain discovery regarding any nonprivileged matter that is relevant to any party's claim or defense – including the existence, description, nature, custody, condition, and location of any documents or other tangible things and the identity and location of persons who know of any discoverable matter.  For good cause, the court may order discovery of any matter relevant to the subject matter involved in the action.  Relevant information need not be admissible at the trial if the discovery appears reasonably calculated to lead to the discovery of admissible evidence.  All discovery is subject to the limitations imposed by Rule 26(b)(2)(C).

FED. R. CIV. P. 26(b)(1).  The relevance standard is broadly construed.  *United States v. Tinoco*, 304 F.3d 1088, 1120 (11th Cir. 2002) (stating that "standard for what constitutes relevant evidence is a low one"); *Kipperman v. Onex Corp.*,

AO 72A
(Rev.8/8
2)

No. 1:05-CV-1242-JOF, 2008 WL 1902227, *10 (N.D. Ga. Apr. 25, 2008). At the

same time, Rule 26(b)(2)(C) states that

> [o]n motion or on its own, the court must limit the frequency or extent of discovery otherwise allowed by these rules or by local rule if it determines that:
>
>> (i) the discovery sought is unreasonably cumulative or duplicative, or can be obtained from some other source that is more convenient, less burdensome, or less expensive;
>>
>> (ii) the party seeking discovery has had ample opportunity to obtain the information by discovery in the action; or
>>
>> (iii) the burden or expense of the proposed discovery outweighs its likely benefit, considering the needs of the case, the amount in controversy, the parties' resources, the importance of the issues at stake in the action, and the importance of the discovery in resolving the issues.

FED. R. CIV. P. 26(b)(2)(C).

Federal Rule of Civil Procedure 37 allows a party to file a motion to compel

discovery, and it considers evasive or incomplete disclosures as a failure to disclose

when ruling on a motion to compel. FED. R. CIV. P. 37(a)(4); *Steed v. EverHome*

*Mortg. Co.*, 308 Fed. Appx. 364, 370 (11th Cir. Jan. 21, 2009). Whether or not to grant

the order to compel is at the discretion of the trial court. *Comm. Union Ins. Co. v.*

*Westrope*, 730 F.2d 729, 731 (11th Cir. 1984).

AO 72A
(Rev.8/8
2)

**B.    Plaintiff Manhattan's First Motion to Compel, [Doc. 243 (Redacted)] (Motion to Compel, [Doc. 247 (Unredacted)]; Response, [Doc. 263];[3] Reply, [Doc. 280]; Amended Defendants' Report Regarding Financial Statements, [Doc. 486])**

**1.    Introduction**

Manhattan seeks from Defendants the following items:

| Request No. | Defendant | Requested Documents |
|---|---|---|
| 33 | Place Entity Defendants[4] | Defendants' Annual internal/management income statements from the date of each Defendants' formation to present |

---

[3]    Wachovia Bank also filed a response.  [Doc. 249].

[4]    In its motion, Plaintiff refers to Defendants Phillips, Braden Copeland ("Copeland"), Place Properties, LP ("PP"), Place Collegiate Properties Company ("PCPC"), Place Properties Development Services, LLC ("PPDS"), Place Management Group, LLC ("PMG"), Place Enterprises, LLC ("PE"), and Webroomz, LLC ("Webroomz") as collectively "Defendants."  It refers to Defendants and non-party judgment-debtor PCD as collectively "Place." It refers to PP, PCPC, PPDS, PMG, PE and Webroomz as collectively "Place Entity Defendants."  For simplicity, the Court will utilize the same system, except it refers to Place Properties, LP, as "PPLP" because that is how that entity was referred to during oral arguments.

AO 72A
(Rev.8/8
2)

| | | |
|---|---|---|
| 50, 24 | All Defendants | Copies of Defendants' audited financial statements for fiscal years 2001-2009 (including without limitation balance sheet statements of income, statement of profits, statement of income, statement of profits and losses, statement of earnings, and statement of cash flow). |
| 51 | Place Entity Defendants | Copies of Defendants' detailed general ledgers for fiscal years 2001 through 2009. |
| 52 | Place Entity Defendants | Copies of Defendants' general journal for fiscal years 2001 through 2009. |
| 53 | All Defendants | Copies of Defendants' federal and state income tax returns for years 2001 through 2009. |
| 1 | Wachovia[5] | Documents reflecting all deposits, withdrawals or transfers, including but not limited to checks, made by or on behalf of any of the Defendants or PCD from January 1, 2002, to the present. |
| 2 | Wachovia | All account statements for Defendants or PCD from January 1, 2002, to the present. |

---

[5]      Wachovia refers to a subpoena served on Wachovia for records relating to all Defendants and PCD.

AO 72A
(Rev.8/8
2)

| 26 | All Defendants | Copes of all Intercompany Management Agreements, tax allocation agreements, overhead or other expense sharing agreements, or similar contracts, agreements, or other documents relating to the management and payment of overhead and other expenses of Defendant, Place Collegiate Development, an[d]/or any of the Other Defendants. |
|---|---|---|

[Doc. 319 at 2-4].[6]

### 2.    Timeliness

Plaintiff's first motion to compel was initially filed on June 1, 2010.  [*See* Dkt. Entry for Doc. 234].[7]  Defendants claim that this was untimely because: (1) the Amended Scheduling Order provided that discovery must be completed on or before May 31, 2010, and the Second Amended Scheduling Order did not alter that date; (2) that date was not subject to an extension even though it was a holiday because the

---

[6]    The text of this and the other charts was copied from Plaintiff's Executive Summary.

[7]    The first iteration of this first motion to compel was filed on June 1, 2010, as Document 234, [*see* Dkt.], along with a motion to file excess pages, [Doc. 233].  On June 2, Judge Duffey denied (in relevant part) the motion to file excess pages and ordered Plaintiff to file a revised motion to compel, [*see* Dkt. Entry for 06/02/2010], which Plaintiff did on June 4 as Document 243, [*see* Dkt.].

AO 72A
(Rev.8/8
2)

notes to the 2009 amendments for Rule 6 state that "[t]he time-computation provisions of subdivision (a) apply only when a time period must be computed," not "when a fixed time to act is set" (as here); and (3) Plaintiff unduly delayed in filing the motion, which "indiscriminately ask[ed] for years of financial and accounting data, from nine persons and entities, claiming merely that its expert wants the documents." [Doc. 263 at 11-13].

Plaintiff responds that: (1) Defendants are apparently arguing that a movant must file a motion to compel early in the discovery process, contrary to Local Rule 37.1(B), which states that such a motion "must be filed within the time remaining prior to the close of discovery or, if longer, within fourteen (14) days after service of the disclosure or discovery response upon which the objection is based"; and (2) the Court allowed the motion to be filed on June 1, as indicated in an email from Judge Duffey's Deputy Clerk to Plaintiff's counsel stating that "[b]ecause Monday is a holiday, the deadline is extended to Tuesday." [Doc. 280 at 9; Doc. 280-5 at 2].

First, the Court rejects Defendants' contentions that Plaintiff's delay in filing the motion until the last moment bars the relief requested. Although the Court has the authority to deny the motion on that ground, *Hinson v. Clinch Cnty.*, 231 F.3d 821, 826 (11th Cir. 2000) (holding that court did not "abuse its discretion in denying . . . [a] motion to compel production due to . . . delay in bringing the motion"),

10

this is not the appropriate case for the Court to exercise its defaulting power, given the bulk of materials that were produced in this case and the time required for Plaintiff to review them. *See* T37.

On the other hand, the local rules of this Court support a conclusion that Plaintiff's motion was untimely filed. They state in relevant part that "[u]nless otherwise ordered by the court, a motion to compel a disclosure or discovery must be filed within the time remaining prior to the close of discovery." N.D. Ga. R. 37.1(B). In this case, the District Court directed that discovery end on May 31, 2010. [Doc. 87]. While Rule 6 of the Federal Rules of Civil Procedure applies when "computing any time period," FED. R. CIV. P. 6(a), the advisory notes for the 2009 amendments to Rule 6 speak directly to the issue before the Court:

> The time-computation provisions of subdivision (a) apply only when a time period must be computed. They do not apply when a fixed time to act is set. The amendments thus carry forward the approach taken in *Violette v. P.A. Days, Inc.*, 427 F.3d 1015, 1016 (6th Cir. 2005) (holding that Civil Rule 6(a) "does not apply to situations where the court has established a specific calendar day as a deadline"), and reject the contrary holding of *In re American Healthcare Management, Inc.*, 900 F.2d 827, 832 (5th Cir. 1990) (holding that Bankruptcy Rule 9006(a) governs treatment of date-certain deadline set by court order). If, for example, the date for filing is "no later than November 1, 2007," subdivision (a) does not govern. But if a filing is required to be made "within 10 days" or "within 72 hours," subdivision (a) describes how that deadline is computed.

11

FED. R. CIV. P. 6 advisory committee's note 2009 amendment. As a result, because Judge Duffey ordered discovery to end by a date certain, *i.e.*, May 31, Plaintiff's motion was due to be filed on or before that date in order to be timely. Plaintiff's motion, filed on June 1, was untimely because it was due to be filed on May 31.

The question then remains whether the District Court extended the deadline under Local Rule 37.1(B) when the Deputy Clerk advised via e-mail that the motion could be filed after the Memorial Day Holiday. Regardless whether the e-mail constituted a formal ruling, the Court finds that Plaintiff acted reasonably in reliance on the e-mail communication, because here: (1) although Plaintiff's counsel should have consulted opposing counsel before contacting the District Court's Deputy Clerk,[8] Plaintiff's counsel's reliance on the assurance that the filing could be made on June 1 was not entirely unreasonable; and (2) any technical lateness was not prejudicial to Defendants. *Cf. Godoy v. Office of Bar Admissions*, Civil Action No. 1:05-CV-0675-RWS, 2006 WL 2085318, *3 (N.D. Ga. July 25, 2006) ("[A]bsent serious, actual prejudice to another party, district courts . . . have exercised the inherent authority to manage their docket so as to grant enlargements of time . . . ."). Therefore,

_____

[8] As the undersigned emphasized at the December 2010 hearing, "[t]he right thing to do, what the Court expects lawyers to do, is before you run to the Court or to the clerk, you reach out to opposing counsel." T185.

12

the Court concludes that to strictly enforce the time limitations in such a circumstance would be unjust.

"[T]he court, in its discretion, may waive a Local Rule." *Edwards v. Shalala*, 846 F. Supp. 997, 998 n.2 (N.D. Ga. 1994). The Court concludes that the circumstances of this case warrant such a waiver. As a result, the Court will decide the motion on its merits..

### 3. Merits

#### a. Arguments of the Parties

As will be shown, neither side in this case has been failed by the lack of determined, dogged legal representation. Every argument that could be raised on behalf of the litigants has been raised. The Court attempts to summarize all the arguments presented, before announcing its rulings.

As it argued back in February 2010, [Doc. 68 at 22], Plaintiff contends that it cannot obtain the whole forensic history of the relationship between PCD and Defendants and the latter's exploitation of PCD's corporate form and efforts to evade the judgment unless it is authorized to review this entire range of documents, [Doc. 319 (Plaintiff's "Executive Summary of Outstanding Discovery Disputes") at 3]. It further contends that Defendants "backdated" accounting entries by up to 3 years in order to

13

remove assets from PCD and render it judgment-proof. [*Id.* at 3]. It argues that access to these materials would demonstrate that PCD was historically profitable as well as help Plaintiff understand what it argues were transactions that drove PCD into insolvency, including the sale of properties to Educational Realty Trust ("ERT"), the sale of property at Underground Atlanta, and the "transfer of profitable prospective and existing development projects to other Place companies while keeping unprofitable projects on PCD's books." [*Id.* at 4]. Finally, Plaintiff seeks "shared expense documents" that it believes are necessary to show that Place commingled funds and that PCD paid Place's expenses without adequate consideration after the arbitration judgment was entered. [*Id.* at 5].

As noted, the District Court already had required Defendants to disclose records pertaining to the June 1, 2004, to December 31, 2006, time frame. *See* T50. Plaintiff requested documents from January 1, 2001, to June 2004. At the December 2010 hearing, the Court asked Plaintiff to demonstrate specific events outside of the period already covered by the District Court's order to justify expanding allowable discovery. *See* T50. Plaintiff initially stated that "payroll dollars were put into PCD, there were pursuit costs prior to 2005," T53, *contra* T86, then continued by saying that "the gist of why we need it is so GlassRatner [Plaintiff's forensic expert] can do testing and look

AO 72A
(Rev.8/8
2)

at the way the company existed at the time that the contract was signed, show that it was profitable, [that] it was the only development entity, and extrapolate forward what happened to other projects."  T54; *see also* T55 (noting that the request was for "historical purposes").  In the Court's view, this showing was inadequate to expand the discoverable period as set by the District Court, since Plaintiff already had obtained documents showing pursuit costs[9] on PCD's books from 2005 to 2009, although it did not have information as to who paid these costs or if they were paid, *see* T57-58.

Plaintiff then offered the following as demonstrating the misconduct necessary to expand the District Court's discoverable time frame.

(a)     Beginning in 2005, PCD Student Housing Development duties were transferred to PPDS, and then to PPD, so that PCD did not generate any cash;

(b)     As of 2004, PCD was performing payroll for the related defendant entities even though it had no employees;

(c)     In 2008, funds were swept daily from corporate accounts into PPLP so that PCD would have no cash subject to seizure;

---

[9]     "Pursuit costs" are "expenses to determine if a student or military housing project [is] viable."  [Doc. 319 at 12].

15

(d)     Defendants claimed to have a shared-expense agreement, but they had not disclosed the underlying details;

(e)     PCD was paying expenses from 2004 onward for other entities or individuals who were unrelated to PCD;

(f)     In 2006, the proceeds for the sale of 13 housing projects went through PCD;

(g)     In 2005, as the arbitration proceeding was beginning, PCD began capitalizing pursuit costs for the first time;

(h)     A new account in 2005 began writing off PCD assets that resulted in a net payable to PPLP;

(i)     In 2006, PCD recognized $8.3 million in receipts from a project at Underground Atlanta, but it was reclassified as revenue of PPLP in August 2006, causing PCD to have a $9 million loss;

(j)     In 2006, PCD's liability to PPLP was increased by approximately $1.75 million for microwave replacement related to the Underground Atlanta transaction; and

(k)     Between April 2007 and June 2008, PCD's accounting records were backdated to remove its fixed assets.  T63-70.

16

In response, Defendants argued that Plaintiff had failed to identify specific facts as to one or more Defendants that would justify broadening the discovery beyond that already allowed by the District Court. They also contended that they had produced materials outside of the District Court's established time frame, namely PCD's general ledgers from 2003 to 2009, T72-74, inter-company ledgers between PPLP and PCD, T75, and all transactions between PCD and other entities, T73-74.

Defendants further contended that in 2005, after PCD sustained losses, a new investor – Blue Vista – sought a different developer for projects, and PPDS was created for that purpose, T81. PCD's pursuit costs were transferred to the new entity, which paid PPDS dollar-for-dollar for the costs, T81-82. They argued that the reason PCD did not book pursuit costs prior to 2005 was that in prior years those costs were expensed, but in 2005 they were booked as assets, T82-83. Thereafter, any pursuit costs incurred for projects that were not developed became abandoned pursuit costs on PCD's books, while pursuit costs associated with any viable project were sold to PPDS. T83; *see also* T86-87. Since PPDS was the developer on those projects that went forward, bearing the risk as well as the profit, PCD had no claim to PPDS's successful development of any of the projects it was involved in. *See* T84-85. They also contended that since PCPC had a limited existence – being a general partner to PPLP,

AO 72A
(Rev.8/8
2)

in which it had a 1 or 2% interest, and not having any contact with the outside world – Phillips's reference to it referred to as a "shell" did not itself provide a basis for compelling documents, T88; *see also* T89.

Defendants then offered a point-by-point rebuttal of "a long laundry list" of assertions made by Plaintiff's at the December 2010 hearing. T87. With respect to the argument that "somebody thought that 'Place' . . . was a department rather than a particular entity," T89 (referencing T64), Defendants simply noted that different people use words to mean different things in different contexts, T90.

With respect to the argument concerning Section 2.9 of the contract, *see* T8, Defendants asserted that if that provided a basis for compelling documents, it should have been provided at that time. T90. Further, Defendants objected under the rule of completeness, saying that the entire document should have been provided so that the definition of "owner" – among other things – could be seen. T90.

With respect to the argument that PCD had no W-2 employees, Defendants agreed, stating that PMG was the W-2 employer for a group of affiliated companies during the bulk of the time period under discussion,[10] and that each of the entities was

_____

[10]     At some point, the W-2 employee functions of PMG were transferred to Place Service Grouping (not a party to the litigation). T92.

AO 72A (Rev.8/8 2)

separately billed for the payroll of the employees that worked for each particular entity. T90-91, 92.[11]  Defendants acknowledged that PCD acted as a disbursing agent by essentially providing banking services for other entities.  In this regard, they explained, for example, that PMG paid a payroll-processing entity and then PCD would bill the other entities (such as Webroomz) for such services.  T93; *see also* T105-09. Defendants also noted that while Manhattan claimed that this conduct occurred in 2005, it had been provided all of the records for 2005.  T93-94.

Defendants further contended that the use of shared logos did not warrant expanded discovery because shared logos among related companies are commonplace, and that even Manhattan used a single logo for a number of different companies.  T91-92.

Defendant also argued that the District Court specifically addressed zero-balance accounts ("ZBAs") and required a report for production of bank statements regarding ZBAs.  They also argued that allegations pertaining to a discovery failure regarding ZBAs were not contained in the pending motions to compel.  *See* T94.  Further, Defendants asserted that although money flowed from PCD during the relevant period,

_____

[11]      Defendants noted that Manhattan operated in the same way, being part of a large group of companies with a single W-2 employer, Runy Holding, Inc.  T91.

19

AO 72A
(Rev.8/8
2)

rough analysis indicated that PPLP had lent more money to PCD than PCD had paid out. T97. They countered Plaintiff's contention that although PCD was insolvent as of 2005 it continued to complete development contracts, by arguing that PPLP poured over $20 million into PCD. *See* T98. As a result, Defendants asserted that, rather than money being siphoned out of PCD, in reality the net effect over the relevant period of time was that $20 million was being invested in it. T98.

With respect to the facilities-and-services agreements ("FSAs"), Defendants admitted that there were two (one dated January 1, 2007, the other dated January 1, 2008), but both had already been produced. T99-100; *see also* T101-03. According to Defendants, the FSAs reflect how the related companies operated so that the expenses of each entity were reasonably allocated and borne by that particular entity. T103. Because billings were charged using inter-company accounts instead of invoices, Defendants stated that there are no invoices dealing with the FSAs. T102.

Defendants next contended that Copeland legitimately charged expenses to PCD. T103-04. They contended that his cell-phone bill was appropriately charged to PCD because Copeland was a manger at PCD at the time he submitted the bill. T104. They acknowledged that travel expenses were erroneously charged to PCD, but contend that within six to eight months after the charges, the error was corrected. *Id.*

AO 72A
(Rev.8/8
2)

Plaintiff had contended that part of the diversion of PCD assets involved payments to Copeland and Phillips in connection with the ERT transaction. *See* T67, 109 (referring to Plaintiff's assertion that PCD developed and paid expenses for housing projects, and when they were sold, Copeland received $1 million and Phillips received more than $8 million). According to Defendants, (1) PPLP owned 16 single-purpose entities ("SPEs"), all or nearly all of which had been developed by PCD,[12] T109; (2) ERT contracted with PPLP for the purchase of the SPEs, with a cash payment at closing in January 2006 of approximately $29 million, T110-11; (3) since PCD was serving as a disbursing agent during this time period, PPLP instructed ERT to transfer the $29 million into PCD's bank account under "an escrow-type arrangement,"[13] *see* T110-11; (4) an accounting entry was made on inter-company accounting records that $29 million was owed from PCD to PPLP, T111; (5) PCD transferred about $16 million of the $29 million to various owners of PPLP, including $8.125 million to Phillips and $1 million to Copeland, T111; and (6) after the disbursement were made, the net result

---

[12] PCD had received a development fee and had signed a contract with the SPEs for the purpose of developing the property. T109.

[13] Defendants explained that there was no formal contract or escrow agreement, but "it was handled by the same people who were managing the transaction and dealing with the transaction. They were giving instructions and they all worked on the same floor o[f] the same office building . . . ." T113-14.

AO 72A
(Rev.8/8
2)

was that PCD had received a $5 million cash loan, T111, which helped PCD with its liquidity, T113; *see also* T112-13.[14]

Next, as to changing how PCD accounted for pursuit costs, Defendants acknowledged that in 2005, PCD began capitalizing pursuit costs. They also established accounting categories for abandoned pursuit costs and development fee reduction (which occurred when projects initially thought to be profitable turned out to be unprofitable). T113-14. Defendants asserted that these entries "accurately reflected the transactions as they occurred from a management standpoint." T115.

Defendants also contended that the request for all Defendants' income statements from their formation is unreasonable with respect to Webroomz, because Webroomz developed software and its income and expenses were totally irrelevant to the piercing claim. *See* T122-23. Defendants also contended that the same argument applied for PCPC, PMG, and the other entities. T123; *accord* T151.

In rebuttal, Plaintiff maintained that it needed the general ledgers from 2003 to June 2004 and after December 2006. T129. While Plaintiff did not argue that simply because another entity paid for PCD's pursuit costs a piercing event occurred subjecting

_____

[14]       Plaintiff responded that "[t]hey could explain it any way they want, but the money came through PCD at a time that it was insolvent." T136.

AO 72A (Rev.8/8 2)

such party to liability for PCD's debts, Plaintiff nonetheless focused on the assertion that

> it was an asset of the company that was transferred. . . . It was good will, the company had pursued the opportunity, gotten the opportunity, and then the opportunity was transferred to another entity versus the judgment debtor PCD, which had done all of the development work for this company until the judgment was entered, had no income coming in. In essence . . . in the totality of what we've discussed, there was a systematic neutering. . . .

T130-31.

As further evidence that Defendants purposefully removed assets from PCD in order to avoid paying Manhattan's judgment, Plaintiff pointed to the "the microwave issue" and the "sweep account" being instituted "two days before the judgment was entered." T131. In addition, Plaintiff argued that Copeland stated that he re-invested the $1 million received from PCD for the ERT transaction when in fact this was not the case. T132. Instead, Plaintiff stated that Copeland loaned the money to PPLP, for which PPLP gave him a note, and then the money was wired directly into PCD. T132. In other words, instead of PCD signing the note and being listed as the debtor (with the parent PPLP being the guarantor), PPLP was listed as the debtor, yet the money went to PCD. T132-33. Further, Plaintiff contended that when $170,000 was paid to

Copeland as interest on the loan, the payment came from PCD even though PPLP was the debtor. T133.

In addition, Plaintiff argued that it needed the consolidated financial statements in order to determine whether the shared-expense arrangement was accurate. *See id.* Plaintiff noted in particular that PPLP was not a party to the FSA dated January 1, 2007, "so any expenses that are incurred by the other entities for PPLP are ostensibly not part of it." *Id.*

Next, Plaintiff contended that on two occasions, bond monies were impermissibly used.[15] First, Phillips purportedly paid $800,000 to settle "some issues between KSU and Phillips and Place," using the money from the construction loan even though the settlement documents specifically stated that the money could not come from loan proceeds. T135. Manhattan also stated that $410,000 in bond money was impermissibly used to pay off Harden Construction Company for phase one, when it was only supposed to be used to pay for phase two. T135. Within weeks of "the" deposition (unspecified), in summer 2010, $410,000 "came to Place Properties to PCD

_____

[15]     The second of these transactions is discussed in greater detail below with respect to the Plaintiff's motion to compel deposition testimony, [Doc. 312]. *See infra* Section I.E.

AO 72A
(Rev.8/8
2)

from a settlement of a receivable," and PCD "immediately flipped it and pledged it as collateral for a loan to PPLP which had nothing to do with PCD." T135.

### b. Discussion

The Court finds that Plaintiff has shown some reason to expand both the extent and the time limits of allowable discovery as allowed by the District Court, and thus Plaintiff's first motion to compel should be granted in part and denied in part. The Court concludes that Plaintiff's showing in its filings and at the December 2010 hearing is sufficient to demonstrate the relevancy of some of its requests and that the relevance of the additional discovery is not outweighed by the additional expense and delay in ordering discovery beyond that initially ordered by the District Court.

First, with respect to **Request No. 33** (income statements from the Place Entity Defendants from the date of formation to the present), the undersigned finds the request excessively broad. It is unclear, for example, how income statements for the years significantly preceding the dispute in 2004[16] could be relevant to Plaintiff's piercing claim. Rather, given that Plaintiff's primary concerns appears to be the diversion of PCD assets by transferring its opportunities to other Defendants, a more properly

---

[16] Plaintiff's counsel stated that the dispute arose at the end of 2004, with the arbitration proceeding commencing in May 2005. T59.

AO 72A
(Rev.8/8
2)

targeted request would focus on those items in particular. While Defendants contend that they paid PCD dollar-for-dollar for these opportunities, Plaintiff need not take their word for it by foregoing otherwise relevant discovery. For this reason, Defendants **SHALL** identify and produce income statements of the Place Entity Defendants to the extent, and only to the extent, that the statements show: (1) each opportunity/project for which PCD incurred pursuit costs (including abandoned pursuit costs), which project then was transferred to a named Place Entity Defendant and pursued; (2) the amount of pursuit costs incurred by PCD for such project; (3) the amount PCD was paid for the transfer of the opportunity; (4) the Place Entity Defendant(s) that paid PCD pursuit costs to obtain the opportunity, the amount(s) paid and the date(s) of payment; and (5) the income received by any Place Entity Defendant from each opportunity/project (even if a defendant subsequently transferred part or all of the project to another entity, so long as the defendant received income for the project). *See* T152-54.

Second, with respect to **Request Nos. 50 and 24** (requests for all Defendants' audited financial statements for fiscal years 2001-2009), the Court also finds these requests excessively broad. Plaintiff did not demonstrate the relevance for disclosure of financial statements prior to the dates previously authorized by the District Court. On the one hand, consistent with the showing Plaintiff made as to the pursuit costs,

26

although Defendants might have a perfectly innocent explanation of the actions taken in 2007 and 2008 as to PCD, its opportunities and its assets (or lack thereof), Plaintiff is entitled to documentation in order to challenge Defendants' version of events. On the other hand, the Court rejects Plaintiff's argument that it needs a larger universe of evidence in order to place Defendants' and PCD's financial structure and transactions in an historical context. Plaintiff has not demonstrated that such an historical context is relevant to any claim or defense in this case.

At the December 2010 hearing, the undersigned identified the statements for the years 2006-2008 as relevant and ordered Defendants to report to the Court within fourteen days as to which entities were included by audited consolidated financial statements and as to whether the statements could be separated out defendant-by-defendant. T155-57. Defendants subsequently indicated that: (1) the audited financial statements not only included entities other than Defendants but also did not include all Defendants; (2) the financial accounting system on which Defendants' financial records are kept was capable of generating unaudited consolidated financial statements for Defendants, excluding non-defendant entities; (3) the unaudited reports would be generated from the same financial accounting database used to generate the audited financial statements; and (4) the unaudited reports could be printed within a day.

27

[Doc. 486 at 2 & n.2]. Based on the information presented in the briefs, at the December 2010 hearing, and in Defendants' subsequent report to the Court, the Court **ORDERS** the following: Defendants **SHALL** provide Plaintiff with the unaudited consolidated financial statements for Defendants only (*i.e.*, excluding non-defendant entities) covering fiscal years 2006-2008.

Third, with respect to **Request Nos. 51 and 52** (requests for the Place Entity Defendants' detailed general ledgers and general journals for fiscal years 2001-2009), the Court concludes that the request should only be **GRANTED IN PART**. Based on the information presented in the briefs and the December 2010 hearing, and because those items have already been produced for the years up through 2006, T157, the Court orders the following: Defendants **SHALL** provide Plaintiff with the detailed general ledgers and general journals for fiscal years 2007 and 2008. *See* T157, 176. While non-party PCD claims to have already produced its own general ledgers and general journals from 2004 through 2009, [Doc. 276 at 5], the production of these items for the Place Entity Defendants for the specified years is relevant not only to show funds transfers between the Place Entity Defendants and PCD but among the Place Entity Defendants themselves, which is relevant to Plaintiff's claim that the entities shared expenses and paid bills interchangeably. While not determinative of Plaintiff's claim

28

that Defendants' ignored PCD's separate corporate status, given that Defendants

concede that PCD was used as a clearinghouse for Defendants' expenses, Plaintiff has

demonstrated the relevance of inspecting these documents to challenge the propriety

of funds going in and out of PCD.

Fourth, with respect to **Request No. 53** (requests for all Defendants' federal and

state income tax returns for the years 2001-2009), the Court **DENIES** the request.  The

Eleventh Circuit has not addressed the standard that courts are to employ in deciding

whether tax returns are discoverable.  However, courts in this Circuit have held that a

heightened showing is needed before a party may be entitled to disclosure of the

opponents' tax returns:

> With respect to the disclosure of tax returns and other personal financial information, this court has stated, "most courts do not recognize the existence of privilege against disclosure [of tax returns], but rather recognize a general federal policy limiting disclosure to appropriate circumstances."  *Beller v. Credit Alliance Corp.*, 106 F.R.D. 557, 559 (N.D. Ga. 1985) (quoting *Elgin Federal Credit Union v. Cantor, Fitzgerald Sec. Corp.*, 91 F.R.D. 414, 416 (N.D. Ga. 1981)).  In general, most courts have noted that public policy concerns favor keeping tax returns confidential when possible, and have ordered production only when the relevance of the information is clear and there is a compelling need.  *See, e.g., Lemanik v. McKinley Allsopp, Inc.*, 125 F.R.D. 602, 609 (S.D.N.Y. 1989); *Biliske v. American Live Stock Ins. Co.*, 73 F.R.D. 124, 126 n.1 (W.D. Okla. 1977).  As one court has stated, in denying an order to compel disclosure of financial information: "The parties should not be permitted to roam in shadow zones of relevancy and to explore a matter

which does not presently appear germane on the theory that it might conceivably become so." *Lemanik*, 125 F.R.D. at 608.

*Columbus Drywall & Insulation, Inc. v. Masco Corp.*, Civil Action No. 1:04-CV-3066-JEC, 2006 WL 5157686, *7 (N.D. Ga. May 31, 2006).[17] Thus, the Court adopts the two-prong test to assure a balance between the liberal scope of discovery and the policy favoring the confidentiality of tax returns. "First, the court must find that the returns are relevant to the subject matter of the action. Second, the court must find that there is a compelling need for the returns because the information

---

[17]    Some District Courts have held that *Maddow v. Procter & Gamble Co., Inc,*, 107 F.3d 846 (11th Cir. 1997), makes relevance – not "compelling need" – the proper threshold for disclosure of tax returns. *See, e.g., U.S. v. Certain Real Property Known As and Located at 6469 Polo Pointe Way, Delray Beach, FL*, 444 F. Supp. 2d 1258, 1263-64 (S.D. Fla. 2006); *Platypus Wear, Inc. v. Clarke Motet & Co.*, No. 06-20976-CIV, 2008 WL 728540, *3 (S.D. Fla. Mar. 17, 2008). In so finding, these courts have relied upon the *Maddow* decision where the Eleventh Circuit affirmed a district court's decision to compel production of tax returns because the information was "arguably relevant" to the case. 107 F.3d at 853. The undersigned agrees with the court in *Camp v. Correctional Med. Servs.*, Civil Act. No. 2:08cv227-WKW (WO), 2009 WL 424723, *3 n.3 (M.D. Ala. Feb. 17, 2009), where the court concluded that "these courts read too much in to *Maddow* which did not hold that relevance is the sole test for production of income tax records. There is nothing in *Maddow* which suggests that the issue of compelling need was raised; it certainly was not decided." Also, given the compelling governmental interest that taxpayers accurately report their income and expenses on annual tax returns, it makes sense to require a heightened standard before these returns are produced in litigation between private parties. The quasi-voluntary tax reporting and collecting system is not served well if taxpayers were additionally concerned that disclosure of their returns could be compelled in private-party civil litigation on the rather low threshold of relevancy.

AO 72A
(Rev.8/8
2)

contained therein is not otherwise readily obtainable." *A. Farber & Partners, Inc. v. Garber*, 234 F.R.D. 186, 191 (C.D. Cal. 2006); *see also Lemanik*, 125 F.R.D. at 609.

The Court finds that Manhattan has not met the compelling-need prong necessary to require Defendants to disclose their tax returns. It is not apparent to the Court how those returns alone would provide Plaintiff with information sufficiently relevant to their piercing claim, and Plaintiff has not made a sufficient showing to indicate otherwise. *See* T158-59. Nor has Plaintiff demonstrated that the proof it seeks is not obtainable from other sources, particularly in light of the other discovery the Court is directing in this Order. For this reason, the Court determines that Defendants shall not be required to produce any income tax returns.

Fifth, with respect to **Requests Nos. 1-2** (requests directed at Wachovia Bank for all accounts statements for Defendants or PCD and documents reflecting all deposits, withdrawals, and transfers made by or on behalf of any Defendants or PCD from January 1, 2002, to present), the Court **DENIES** the requests. Putting aside the contentions that the Wachovia requests are not properly before the Court because they already have been ruled upon, T168-71,[18] and that the proper procedures for a motion

---

[18] The Court notes that Plaintiff's counsel appeared to dispute that any of the Wachovia documents had been produced, T164, contrary to the claims of PCD's counsel, T164-65.

31

AO 72A (Rev.8/8 2)

to compel with respect to a subpoena served on a third party were not properly followed, T173, the Court finds that "the burden or expense of the proposed discovery outweighs its likely benefit," FED. R. CIV. P. 26(b)(2)(C)(iii). Plaintiff failed to make a sufficient showing that the information obtained for the expanded time frame (*i.e.*, beyond what Judge Duffey previously ordered) would be sufficiently relevant to outweigh the burden and expense that would be imposed on Wachovia in going through all of the documents (even if Plaintiff were to pay the expense of production). *See* T175-77. For this reason, the requests are **DENIED**.

Finally, with respect to **Request No. 26** (request for copies of all Defendants' inter-company management agreements, tax allocations agreements, expense-sharing agreements, or similar documents related to the management and payment of overhead and other expenses), the Court determines that Defendants should produce any such documents from 2006-2009. At the December 2010 hearing, Defendants provided the Court with a document (the first page of which was labeled "Place Properties Overhead Alloc – Summary, Jan to Jun 2007") that the Court found sufficient to comply with Request No. 26 for part of the year 2007. T162. Plaintiff did not believe it had the documents, while Defendants claimed to have already produced them but indicated that they were in any event readily available and that copies could be provided to Plaintiff.

32

*See* T159-163. Given Defendants' amenability to providing the documents – which the Court appreciates – the parties **SHALL** conduct themselves as follows: (1) to the extent any of the requested documents have been produced previously and are Bates-stamped, Defendants shall provide those numbers to Plaintiff; (2) Plaintiff shall look to see if it has the relevant documents; (3) if Plaintiff does not have the relevant documents, it shall notify Defendants, who shall comply with Request No. 26 by providing the requested documents for the years 2006-2009.[19]

For the reasons above, Plaintiff's first motion to compel, [Doc. 243], is **GRANTED IN PART AND DENIED IN PART**.

---

[19] The Court acknowledges Defendants' statement that "[t]here was nothing done during '06," T162, suggesting that documents for 2006 do not exist.

33

AO 72A
(Rev.8/8
2)

**C.** **Plaintiff's Motion to Compel Discovery from PCD, [Doc. 252] (Response, [Doc. 276]; Reply, [Doc. 308])**

    **1.** **Introduction**

Manhattan requests that the Court compel the following responses from PCD:

| Request No. | Defendant | Requested Documents |
|---|---|---|
| 2 | PCD | Any and all documents reflecting all payments, deposits, withdrawals or transfers, including but not limited to checks, made by or on behalf of PCD in connection with the Project from January 1, 2002, to the present. |
| 4 | PCD | Any and all documents showing projects (including, but not limited to, any identifiable venture, construction project, management contract or other business opportunity that PCD or a company or individual associated with Place Properties, LP or its owners considered, whether the project was pursued or abandoned) for which PCD disbursed or expended funds between 2004 and 2009, including documents showing the amount of funds disbursed, dollars expensed by PCD, dollars capitalized by PCD, preferably with these amounts accumulated by year. |

AO 72A
(Rev.8/8
2)

[Doc. 319 at 11-12].[20]

---

[20]   In the actual motion to compel (as opposed to the Executive Summary),
Manhattan requests that the Court compel non-party judgment-debtor PCD to

> immediately produce documents responsive to Request Nos. 1-2, 4, and
> 8-9 of Manhattan's May 24, 2010 Subpoena to Produce Documents,
> Information, or Objects or to Permit Inspection of Premises, including:
>
> (1)    Documents evidencing expenses and payments related to the
>        construction of student housing at Kennesaw State University,
>        including payments to employees who worked on the project;
>
> (2)    Documents evidencing other construction projects with which PCD
>        was involved; and
>
> (3)    Documents evidencing the allocation and payment of shared
>        expenses among PCD and other entities from January 1, 2003 to the
>        present (collectively "Requested Discovery").

[Doc. 252 at 1-2].  In its response to the motion, PCD noted the following:

> Although PCD made a good faith effort to provide as many responsive
> documents as possible in response to the Subpoena, Plaintiff filed its
> Motion to Compel alleging that PCD failed to produce documents in
> response to Request Nos. 1-2, 4, and 8-9 (the "Disputed Requests").  The
> Disputed Requests as well as PCD's original responses are set forth in full
> in Plaintiff's Motion to Compel.  Contemporaneously with the filing of
> this response brief, PCD served its amended and restated responses to the
> Subpoena, which clarifies and renders moot any issues with regard to
> Request Nos. 1 and 8-9.  Accordingly, the scope of this response brief will
> be limited to address any issues related to PCD's response to Request Nos.
> 2 and 4 (the "Limited Disputed Requests").

[Doc. 276 at 3-4].  In its reply, Manhattan also focused on Request Nos. 2 and 4.

AO 72A
(Rev.8/8
2)

## 2.    Timeliness

It is not clear to the Court that PCD properly objected to the subpoena on timeliness grounds.  The subpoena underlying Plaintiff's motion to compel discovery from PCD was served by Plaintiff on PCD on May 24, 2010.  [*See* Dkt. Entry for Doc. 212].  In its objections to both Requests 2 and 4, Defendant objected as follows:

> PCD objects to this request as overly broad, unduly burdensome, not reasonably limited in time and scope, and not reasonabl[y] calculated to lead to the discovery of admissible evidence.  Subject to the foregoing objections and without waiving the same, PCD states it will produce documents responsive to this request, if any, in its possession, custody and control at a mutually agreeable time and place.

[Doc. 252-1 at 6-7].  These objections do not squarely present an objection that PCD had inadequate time to comply with the subpoena.  Although the Court has not located any Eleventh Circuit case discussing the issue, other courts have held that Rule 45's requirement to file objections includes the dictate that all objections be raised.  *In re DG Acquisition Corp.*, 151 F.3d 75, 81 (2d Cir. 1998) ("We believe that Rule 45(c)(2)(B) does require the recipient of a subpoena to raise all objections at once, rather than in staggered batches, so that discovery does not become a 'game.' ")

---

[Doc. 308 at 2-3].

36

(quoting *United States v. Bryan*, 339 U.S. 323, 331 (1950)); *see also Oneida, Ltd. v. United States*, 43 Fed. Cl. 611, 616 (1999) (quoting *DG Acquisition Corp., id.*).

In addition, Rule 45 states that "[o]n timely motion, the issuing court must quash or modify a subpoena that . . . fails to allow a reasonable time to comply." FED. R. CIV. P. 45(c)(3)(A)(i). No such motion was filed, and thus the issue as to the subpoena's timeliness is waived.[21] As a result, the Court does not address the timeliness of the subpoena.[22]

---

[21] Because no motion was filed at all, the Court need not discuss whether the unreasonable time to respond to the subpoena also affected the time allowed for a motion to quash to be filed. *See generally U.S. ex rel. Pogue v. Diabetes Treatment Ctrs. of Am., Inc.*, 238 F. Supp. 2d 270, 278 (D.D.C. 2002) (discussing timeliness issues of motion to quash Rule 45 subpoena).

[22] To the extent that the District Court disagrees that PCD's timeliness objection was waived (inasmuch as Plaintiff never argued that PCD's objection was waived), the Court would conclude that the subpoena was unreasonable given the short time it allowed for compliance. PCD argues that the subpoena provided only four business days (ending on Friday, May 28, 2010, at 3:00 p.m.) for PCD to respond to the "voluminous" requests, that the deadline was unreasonable, and that such a short time frame "casts doubt on the legitimacy of the [s]ubpoena." [Doc. 276 at 2-3]. In reply, Plaintiff asserts that Defendants mischaracterize the events, stating: (1) PCD failed to request an extension to respond to the subpoena, although Manhattan worked in good faith and extended deadlines on other subpoenas; (2) PCD insisted that the subpoena be served on PCD's registered agent, although PCD's counsel had been active in the litigation for many months and were receiving electronic notices through the Court's electronic case filing ("ECF") system; (3) PCD did not produce any responsive documents until June 9, 2010; and (4) PCD did not attempt in good faith to limit the scope of the subpoena. [Doc. 308 at 4-5]; *see also* T29-30, 183. At the December 2010

3.      **Merits**

a.      **Arguments of the Parties**

Plaintiff contends that compliance with Request No. 2 is necessary "to fully analyze and understand how expenses and revenue were allocated for the student housing project at Kennesaw State University, which was at issue in the underlying arbitration," while compliance with Request No. 4 is required

> to demonstrate how PCD disbursed money for "Pursuit Costs" (expenses to determine if a student or military housing project was viable), which should be offset by development fee revenue, how PCD was forced to retain expenses for "Abandoned Pursuit Costs" for non-viable projects,

_____

hearing, PCD argued that the four-day period in which to respond to the 44 categories of items requested was inappropriate given the "two or three" extensions of the discovery period, suggesting that Plaintiff had ample opportunity to ask any questions about journal entries earlier.  T166.

The Court concludes that the subpoena was not submitted with a reasonable time to reply, and therefore if the District Court finds that PCD did not waive the objection, the motion to compel should be denied because the subpoena imposed an undue burden on PCD.  "[B]ecause a reasonable time must be provided to comply with a subpoena, a discovery subpoena should be served a reasonable time in advance of the expiration of the discovery deadline so that compliance may be obtained before expiration." 9 MOORE'S FEDERAL PRACTICE § 45.03 (citation omitted).  Here, given the substantial breadth of the request, providing only four days to respond to the request – and only about a week before the end of the extended discovery deadline – was unreasonable. Thus, to the extent that the timeliness of the objection was not waived, the Court would find that a motion to compel based on a subpoena with such an unreasonable time to respond – and so close to the end of discovery – should be denied.  See T233.

AO 72A
(Rev.8/8
2)

and ultimately, how Defendants shifted current and future development
fee revenues for viable projects away from PCD to the Place Entities.

[Doc. 319 at 12].

In response, PCD states that many of the documents have already been produced,

its production was sufficient, and Manhattan has itself repeatedly objected to discovery

regarding other PCD projects by refusing to produce documents on another PCD-

Manhattan project and instructing a witness not to answer deposition questions because

the subject was beyond the scope of the litigation. [Doc. 320 at 11-12]. PCD also

asserts that the requests are overly broad and cumulative of years' worth of financial

information previously provided to Plaintiff on multiple occasions. [Doc. 276 at 4; *see*

*also id.* at 5 ("PCD has repeatedly produced its financial information, vis-à-vis journal

entries and general ledgers, for 2004 through 2009 in various stages of this litigation

and the State Court Lawsuit. . . ."). Specifically, with respect to Request No. 2, PCD

contends that the request should be denied because (1) the District Court at the

February 22, 2010, hearing ordered Wachovia to produce PCD's financial information

for the period of June 1, 2004, through December 31, 2006, and (2) Request No. 2 is

"designed to obtain information well beyond the thirty-month period imposed by the

Court." [Doc. 276 at 5]. With respect to Request No. 4, PCD argues that, "[r]ead

AO 72A
(Rev.8/8
2)

literally, Plaintiff is seeking every blueprint, e-mail, expense report, or cocktail napkin with a sketch of a building which relates to any project that anyone at PCD or *any* company associated with Place Properties, LP considered, thought about, or contemplated." [Doc. 276 at 6 (emphasis in original)]. Further, PCD argues that if the essence of the request is to ascertain the projects PCD spent money on during from 2004 to 2009, PCD's general ledgers and journal entries for those years (already produced) are sufficient to satisfy the request. [Doc. 276 at 6]. Finally, PCD states that it produced several dozen boxes of documents related to various projects for the state court lawsuit, and they are now in offsite storage facilities and can only be retrieved at significant cost to it, a non-party. [Doc. 276 at 6-7].

At the December 2010 hearing, Plaintiff admitted that numerous documents had been produced, but stated that "they were almost solely technical data from the underlying arbitration that had already been collected. This involves the size of nuts and bolts and leaks up at this Kennesaw State Project. That doesn't help move this litigation at all. . . . We produced a hard drive with everything that Alston and Bird had gathered in the underlying arbitration, which is the bulk of those documents. . . . They have given us everything that doesn't help us." T34-35.

## b.    Discussion

The undersigned concludes the motion to compel should be denied.  The grounds for denying **Request No. 2** (all documents relating to payments, deposits, withdrawals, or transfers, made by or on behalf of PCD in connection with the project in issue), are as follows.  First, it includes information clearly compelled from Wachovia on a prior occasion in this very litigation, and Plaintiff has failed to demonstrate why PCD must go through the expense and time to produce documents that Plaintiff already received.

Second, the Court fails to see the relevance in Plaintiff's endeavor "to fully analyze and understand how expenses and revenue were allocated for the student housing project at Kennesaw State University, which was at issue in the underlying arbitration." [Doc. 319 at 12].  The issue in this case is whether Defendants (not PCD) should be held liable for PCD's judgment under a piercing theory and perhaps fraudulent transfers.  How expenses were allocated in the initial construction project are not relevant to either of these issues.  Finally, given the discovery already produced, as well as the additional disclosures the Court concludes should be made, the items sought from PCD under this request are cumulative and duplicative.

Next, **Request No. 4** ("Any and all documents *showing* projects . . . for which PCD disbursed or expended funds between 2004 and 2009, including documents

41

showing the amount of funds disbursed, dollars expensed by PCD, dollars capitalized by PCD, preferably with these amounts accumulated by year.") (emphasis added) is excessively broad.  *Cf. Wright v. AmSouth Bancorporation*, 320 F.3d 1198, 1205 (11th Cir. 2003) (district court did not abuse its discretion in Title VII case by denying motion to compel where party's request was overly broad); *R.M.R. ex rel. P.A.L. v. Muscogee Cnty. Sch. Dist.*, 165 F.3d 812, 816-17 (11th Cir. 1999) (affirming denial of motion to compel where request was overly broad).

Further, to the extent that the purpose of the request is "to demonstrate how PCD disbursed money for 'pursuit costs' . . . , how PCD was forced to retain expenses for 'Abandoned Pursuit Costs,' for non-viable projects, and ultimately, how Defendants shifted current and future development fee revenues for viable projects away from PCD to the Place Entities," [Doc. 319 at 12], a sufficient showing has not been made that the documents already produced – for instance, the general ledgers and general journals – are not sufficient to shed light on relevant fund transfers (and other relevant information).  Absent a more substantial showing, Plaintiff is not entitled to an order compelling satisfaction of this exceptionally broad discovery request.

Accordingly, Plaintiff's motion to compel discovery from PCD, [Doc. 252], is **DENIED**.

42

**D.** **Plaintiff Manhattan's "Second" Motion to Compel, [Doc. 266] (Response, [Doc. 283]; Reply, [Doc. 314])**

**1.** **Introduction**

Manhattan seeks the following items from PPLP, PCPC, PPDS, PMG, and Webroomz:[23]

| Request No. | Defendant(s) | Requested Documents |
|---|---|---|
| 22 | [See footnote 23] | All documents related to PCD general ledger entries "Abandoned Pursuit Costs," "Earnest Money Deposits," "Development Fee Costs," and for the project Underground Atlanta, including documents evidencing any involvement by any Defendant in the transactions or projects subsumed therein, such as receipts, disbursements, and contracts. |

---

[23] While the Plaintiff's Executive Summary states that this request was made against the "Place Entity Defendants" or "All Defendants," [*see* Doc. 319 at 6-8, 10-11], the motion actually only sought discovery from what the motion labeled "the SGR Defendants": PPLP, PCPC, PPDS, PMG, and Webroomz. [Doc. 266 at 1 & n.1]. Thus, as PE's counsel noted at the December 2010 hearing, *see* T150, that motion was not actually filed against PE, despite what is suggested in Plaintiff's Executive Summary.

| | | |
|---|---|---|
| Revised Interrogatory 1 | [See footnote 23] | Describe "Abandoned Pursuit Costs" as used on PCD's income statement, and the purpose of such costs, including the project to which they related, the summary by year of amounts by project, the offsetting general ledger account for the amounts, if the project was constructed and if constructed, by what Place entity, whether or not a Defendant. |
| Revised Interrogatory 2 | [See footnote 23] | Describe "Pursuit Costs" as used on PCD's balance sheet, and the purpose of such costs, including a summary by project to which they related at the beginning and ending date and each intervening each year end, the amount of costs capitalized (increasing the account balance) by project by year, the amount of reductions of costs by project by year (decreases in the account balances) and the offsetting general ledger account for such reductions. |

44

| | | |
|---|---|---|
| Revised Interrogatory 3 | [See footnote 23] | Describe "Earnest Money Deposits" and "deposits" as used on PCD's balance sheet, and the purpose of such deposits, including a summary by project to which they related at the beginning and ending date and each intervening each year end, the amount of costs capitalized (increasing the account balance) by project each year, the amount of reductions of costs by project by year (decreases in the account balances) and the offsetting general ledger account for such reductions. |
| Revised Interrogatory 4 | [See footnote 23] | Describe "Development Fee Revenues" as used on PCD's income statement, and the purpose of such costs, including the project to which they related, the summary by year of amounts by project; for any entries reducing the Revenue amount, the reason for the reductions, the project to which it related and the offsetting general ledger account for the amount of reduction. |
| Revised Interrogatory 5 | [See footnote 23] | Describe "Development Fee Reductions" as used on PCD's income statement, and the purpose of such costs, including the project to which they related, the summary by year of amounts by project. |

| 6 | [See footnote 23] | Any and all engagement letters, fee agreements, invoices, or other documents regarding this action and the attorneys' fees and expenses of this action. |
|---|---|---|
| 7 | [See footnote 23] | Any and all engagement letters, fee agreements, invoices, or other documents regarding the arbitration proceedings and confirmation action alleged in the Complaint, including post-judgment discovery. |
| 8 | [See footnote 23] | Any and all documents identifying what person or which entity paid PCD's legal fees beginning from January 1, 2003 to the present, and the amounts paid. |
| 9 | [See footnote 23] | Any and all documents identifying what person or which entity paid Defendants' legal fees beginning from January 1, 2003 to the present, and the amounts paid. |
| 12 | [See footnote 23] | Any and all documents evidencing whether any Defendant shared, retained, or employed the same employees or independent contractors, attorneys, or law firm. |
| 1 | [See footnote 23] | For any capital that was committed by or to PCD and/or any of the Defendants, please produce all documents showing that the capital was paid in and collected. |

AO 72A
(Rev.8/8
2)

[Doc. 319 at 6-8].[24]

### 2. Timeliness

Plaintiff's "second" (actually third) motion to compel was filed on June 19, 2010. [*See* Dkt. Entry for Doc. 266]. Defendants argue that: (1) the discovery requests were not timely because they were not served until April 30, 2010, and were therefore due on June 1, 2010, yet discovery expired on May 31, 2010; (2) the motion to compel also was untimely because the last possible day for filing was June 18, 2010, yet Plaintiff filed the motion on June 19[25]; and (3) Plaintiff filed its motion in four separate filings between June 19 and June 20, yet all four were incomplete and not in compliance with requirements for motions to compel. [Doc. 283 at 3-7].

In reply, Plaintiff states that: (1) Local Rule 37.1(B) specifically contemplates that motions to compel will be filed after fact discovery has closed, as long as it is within 14 days after the deficient response was served; (2) in any event, Defendants

---

[24] **Request No. 23** was abandoned at the December 2010 hearing. T143, 146. It is therefore **DENIED AS ABANDONED**.

[25] Explaining how they arrived at the June 18 date, Defendants noted that assuming it was appropriate for Defendants to respond on June 1, Plaintiff's motion could only have been properly served within fourteen days of service of Defendants' responses, plus three added days as per Rule 6 because the responses were served by mail. [Doc. 283 at 5].

47

filed five discovery devices on the same day as Plaintiff (April 30, 2010); (3) while the brief was late, it was filed "only hours after midnight due to difficulties filing," and not enough time had elapsed to cause undue prejudice against Defendant; and (4) there is a strong policy in this District of resolving disputes on the merits as opposed to disposition on technicalities. [Doc. 314 at 12-14].

The Court deems the requests served April 30, 2010, to be untimely. N.D. Ga. R. 26.2 states that "[d]iscovery proceedings must be initiated promptly so that discovery is initiated and completed (including the filing of answers and responses thereto) within the time limitations of the discovery track to which the case is assigned."  Defendants had thirty days to respond to the request, *see* FED. R. CIV. P. 33(b)(2), 34(b)(2)(A), yet because the thirtieth day (May 30) was a Sunday – followed by a federal holiday (May 31) – the responses were not due until June 1.  Because discovery ended on May 31 (a date specifically set and therefore not subject to automatic extension on account of the holiday, *see* FED. R. CIV. P. 6(a)), Plaintiff's discovery requests were late because Defendants were not obligated to respond until after the (extended) discovery period expired. *Aviation Specialties, Inc. v. United Techs. Corp.*, 568 F.2d 1186, 1189 (5th Cir. 1978) (holding that although the requests were submitted prior to the deadline for termination of discovery, the date

48

would have fallen beyond the date for termination of discovery and thus were untimely); *cf. Spinks Mech., Inc. v. Bovis Lend Lease, Inc.*, Civil Action No. 1:06-cv-01263-GET, 2007 WL 4564165, *2 (N.D. Ga. Feb. 27, 2007) (denying motion to compel deposition when deposition noticed one week before discovery deadline to be conducted on last day of discovery).[26]

On the other hand, the Court concludes that a proper exercise of its discretion authorizes the waiver of Local Rule 26.2 for purposes of the present motion to compel. *Edwards*, 846 F. Supp. at 998 n.2 (waiving local rule despite motion's untimeliness); *Puhy v. Delta Air Lines, Inc.*, 833 F. Supp. 1577, 1588 n.1 (N.D. Ga. 1993) (waiving local rule despite untimeliness of summary judgment motion and considering merits of motion "in the interests of justice and efficient disposition"). While Defendants own

---

[26] The Court recognizes that a number of cases have come to a different conclusion, but they all predate 2009 or discovery was set to end on a date certain. *See Pohl v. United Air Lines, Inc.*, 194 F. Supp. 2d 840, 843 n.6 (S.D. Ind. 2002) (holding that because discovery deadline fell on Saturday, deadline was extended to following Monday); *Cooper Tire and Rubber Co. v. Farese*, No. 3:02-cv-210, 2008 WL 5188266, *1 (N.D. Miss. Dec. 9, 2008) ("[Plaintiff] correctly pointed out . . . that October 4, 2008, was a Saturday and thus, pursuant to Federal Rule of Civil Procedure 6, the discovery deadline expired on Monday, October 6, 2008."); *Healey v. Allison Transp. Sys., Inc.*, No. 1:05-cv-386, 2006 WL 2325327, *1 n.2 (N.D. Ind. Aug. 9, 2006) ("Since the discovery deadline, July 30, 2006, fell on a Sunday, the discovery deadline was in effect July 31, 2006."); *Toner v. Hazel*, Civ. A. No. 81-1724, 1987 WL 11230, *1 n.1 (E.D. Pa. May 18, 1987) (45-day discovery period ended on a Sunday so it was extended to Monday).

AO 72A
(Rev.8/8
2)

tardy filings on the same day do not in any way excuse Plaintiff's tardiness, *see* T182-83, the Court cannot see how the purpose of the local rule in question is any way obstructed – or how Defendants are in any way prejudiced – by deeming the request timely filed, especially considering that the operation of the federal rules provided Defendants with *more* time to respond than they otherwise would have had.  (It also appears that Defendants made full use of that extra time, [*see* Doc. 229-230 (certificates of service dated 06/01/2010, responding and objecting to Plaintiff's 04/30/10 request)]).  Thus, if anything, Defendants were helped by the timing of Plaintiff's April 30 requests, not harmed. *Cf. Kingsway Fin. Servs., Inc. v. Pricewaterhouse-Coopers LLP*, No. 03 Civ. 5560, 2009 WL 398751, *1-2 (S.D.N.Y. Feb. 18, 2009) (concluding that discovery request was untimely but applying doctrine of equitable estoppel to remedy the unfairness because both parties filed requests for interrogatories).  Influencing the Court's determination is the preference that disputes should be resolved on the merits rather than on the basis of default.  *See Meehan v. Snow*, 652 F.2d 274, 276 (2d Cir. 1981) (citations omitted); *see also Pattee v. Ga. Ports Auth.*,  477 F. Supp. 2d 1272, 1275 (S.D. Ga. 2007) (noting "strong preference" for adjudicating issues on the merits,

AO 72A
(Rev.8/8
2)

rather than on technicalities).  As a result, the Court proceeds to discuss the merits of

Plaintiff's motion.[27, 28]

### 3.    Merits

#### a.    Parties' Contentions

At the December 2010 hearing, Defendants addressed the allegation that in 2006,

there were receipts made by PCD relating to the sale of an Underground Atlanta project

that were later reclassified as receipts to PPLP.  T115-17.  Defendants explained that

the SPE that owned the real estate constituting the Underground Atlanta project was

sold to another entity, and the income was erroneously attributed as income to PCD

---

[27]    The Court has excused at least two defaults by Plaintiff in this case due to technical violations of the rules, and has gone to great lengths discussing how the timing rules operate and may in the exercise of discretion be excused.  These disputes would be avoided if (1) better care would be taken in calculating time limits, and (2) more importantly, the lawyers would cooperate on procedural matters without foregoing substantive rights.

[28]    Defendants also contend that the motion itself was filed late.  Plaintiff concedes it was filed late, but blames the lateness on technical problems.  [*See* Doc. 314 at 13].  Again, this technical tardiness, however, was entirely without prejudice to Defendant, and the Court finds it would be inappropriate to enforce the relevant local rule.  *See U.S. ex rel. Butler v. Magellan Health Servs., Inc.*, 74 F. Supp. 2d 1201, 1214 (M.D. Fla. 1999) (indicating that with respect to untimeliness "the Eleventh Circuit has a vigorous policy of resolving issues on the merits and not on procedural technicalities").  For this reason, the Court **WAIVES** Local Rule 37.1(B) for the purposes of this motion to compel.

AO 72A
(Rev.8/8
2)

instead of PPLP, thus necessitating the reclassification. *See* T115-16. Defendants stated that while PCD developed Underground Atlanta and therefore had received a development fee, it had no ownership interest and therefore was not entitled to any money from the sale. T117.

Defendants also addressed the renaming of the "microwave replacement" account. Defendants asserted that the renaming was without consequence. T118. Defendants dispute that the money "suddenly disappeared," arguing instead that "whatever money was recorded in the microwave replacement account, that that money is still, it is recorded there, whatever that account is." T119.[29] Finally, Defendants emphasized that: (1) Plaintiff's argument only related to the books and records of PCD, not those of any other entity, so the argument should be taken up with PCD; and (2) Plaintiff's stating that it did not know where the money went indicates that it did not go into any of Defendants' accounts. T120.

With respect to the claimed backdating of accounting records to remove fixed assets, Defendants noted that Melanie Bunting[30] testified in her deposition that she had

---

[29]    Plaintiff later responded: "[H]ow could you have microwave replacement for something you don't have an entitlement to to begin with . . . .?" T136.

[30]    Bunting was the vice-president of PMG. She testified on 06/21/2010, [Docs. 404, 411], 07/06/2010, [Doc. 412] (as designee of PCD, (Bunting Dep.

noticed (around 2008, according to Defendants) that there were fixed assets on the books of PCD that should have been recorded on the books of PPLP, so those assets were transferred to PPLP, and the transfer was duly recorded in both PCD and PPLP's accounting records. *See* T120-21.

Addressing Request No. 22, Defendants argued that (1) this request relates to PCD's records, not those of Defendants; (2) the burden in responding to the request would be enormous (totaling an estimated 10,000 line items in the general ledgers and general journals for a time span of two to three years); (3) there is nothing nefarious about switching something from pursuit costs to abandoned pursuit costs, given that all that means is that someone decided not to pursue a project further; (4) this switch to abandoned pursuit costs was not a diversion of funds from PCD but rather an internal transfer to PCD; (5) figuring out what documents relate to a particular earnest money deposit would be a huge burden; (6) Plaintiff has cited nothing pertaining to earnest money deposits, development fee costs, or the project at Underground Atlanta (which Defendants' counsel believed was developed before Manhattan was involved with PCD) that deals with this case; and (7) Plaintiff has not identified a particular diversion

_____

07/06/2010 at 7)), and on 07/07/2010, [Doc. 413 (Bunting 30(b)(6) Dep.)].

AO 72A
(Rev.8/8
2)

of funds, "and particular facts that underlie a particular entity's doing a particular thing[, which] was the standard established by Judge Duffey." T187-90.

In response, Plaintiff argued that (1) in 2006, PCD recognized $8.3 million in receipts pertaining to the Underground Atlanta project, but on August 14, 2006 – during the middle of the arbitration proceedings – that money was reclassified from revenue for PCD to revenue for PPLP (which Plaintiff asserts is "almost fraudulent conveyance per se"), and no known consideration was paid to PCD; (2) PCD incurred costs for microwave replacements even though it did not have involvement in or own the project anymore; (3) in 2005, around the time the arbitration was filed, PCD began capitalizing pursuit costs for the first time; (4) capitalized pursuit costs were later written off as abandoned pursuit costs through a new revenue reduction account called "development fee reduction"; (5) in 2005, the development fee reduction wrote off $3,846,432[31] (which was transferred to Place Properties, meaning it should appear on the consolidated income statements), causing PCD to have negative revenue and become insolvent; and (6) when asked about these accounts later in depositions, the deponents could not explain what the accounts were for, what was written off, and why it was written off. T191-94.

---

[31] This was later described as $3,846,434 (a $2 difference). T194.

Defendants responded that while the Underground Atlanta transaction was developed by PCD and it had received a development fee, PCD had no ownership in it. T195. Defendants further stated that when the project (real estate) was sold, income from that sale was erroneously recorded on the books of PCD as income to PCD but was later correctly reclassified to show that the income flowed to PPLP, the owner the property. T195.

Addressing Revised Interrogatories 1-5 (requests for Defendants to define certain terms), Defendants argued that (1) at an earlier hearing, the District Court described four of the proposed interrogatories as "way too broad," and asked counsel for the parties to narrow them, with Plaintiff to take the initiative; (2) since Plaintiff's counsel was busy, defense counsel narrowed the interrogatories himself and emailed Plaintiff's counsel, asking if the narrowed versions were acceptable;(3) Plaintiff's counsel responded that they were; (4) Plaintiff's counsel later stated that Plaintiff's expert objected to the narrowed versions; and (5) Plaintiff's counsel proposed five additional interrogatories. T197-99. According to Defendants, Plaintiff's acceptance of the narrowed interrogatories constituted an agreement to which Plaintiff is bound, there was no contention that the responses to those narrowed interrogatories were deficient,

55

and the five interrogatories that Plaintiff's expert proposed are additional requests not contained within served discovery requests. *See* T199-200.

Plaintiff responded as follows: (1) while the confirming email was premature, within 48 hours Plaintiff's counsel had informed Defendants' counsel that additional information was appropriate; (2) the responses from the four interrogatories were "basically two sentences [each]"; (3) Plaintiff suggested the other interrogatories before Defendants had responded to the initial four; (4) the two-to-three sentence responses provided by Defendants did not require any time to prepare, and therefore there would have been no prejudice in requiring them to respond to the interrogatories as revised by Plaintiff's expert. *See* T203-05.

Addressing attorney's fees, Defendants stated that they had produced the engagement letters and joint defense agreement and felt that this was sufficient to satisfy Plaintiff's requests. T207. Defendants further asserted that asking for all invoices was inappropriate given that Defendants' counsel did not represent PCD. T207. Plaintiff responded that it wanted to know who paid any of Defendants' fees because it would show all of the entities as interrelated – that they shared expenses and paid bills interchangeably, or that the same entity paid all of the lawyers, T211 – which

56

would counter the assertion that Defendants are all separate companies and individuals. T208-09.

### b.   Discussion

The Court concludes that Plaintiff's third ("second") motion to compel should be granted in part and denied in part.

First, with respect to **Request No. 22** (request for documents relating to PCD's abandoned pursuit costs, earnest money deposits, development fee costs, and the Underground Atlanta project), the Court concludes that the request should be granted in part and denied in part. Any Defendant who was served with Request No. 22 **SHALL** provide to Plaintiff all documents relating to the reclassification of the Underground Atlanta project and the microwave reclassification. While Defendants identify the first reclassification as mere error, T115-16, 195, that error if anything potentially highlights the intimate relationship between PCD and PPLP. Regarding the microwave reclassification, it can hardly be said to "without consequence," T118, contrary to Defendants' conclusory assertion, when the consequence of the renaming is the very issue. An unexplained reclassification of such a substantial amount of money is directly relevant to Plaintiff's claim that there was a diversion of funds from PCD.

AO 72A
(Rev.8/8
2)

Second, the Court **DENIES** the motion with respect to **Revised Interrogatory Nos. 1-5**. *See* T206. Having considered the arguments presented in the briefs, [Doc. 266-1 at 5-7; Doc. 283 at 19-24; Doc. 314 at 4], and at the December 2010 hearing, T196-206, it is clear that an agreement was reached between counsel as to the proper scope of the interrogatories. [*See* Doc. 266-5]. Plaintiff has not attacked the sufficiency of the responses provided (apart from conclusorily asserting that the responses were "deficient," [Doc. 266-1 at 7; Doc. 314 at 4]). As a result, the Court finds that the revised interrogatories are not properly compellable and that any objection to the responses to the earlier four interrogatories has been waived.

Third, with respect to **Request Nos. 6-9 and 12** (requests for information pertaining to attorney's fees and shared employees), the Court concludes that these should be granted in part and denied in part. With respect to attorney's fees, the only inquiry particularly relevant to Plaintiff's piercing claim is the identity of the entity that was paying PCD's legal fees (given that it is PCD's corporate veil that Plaintiff seeks to pierce), not the identities of any payors of the Place Entity Defendants' legal fees. To the extent the latter inquiry might be marginally relevant to Plaintiff's claim if it showed that the Place Entity Defendants shared expenses and paid bills interchangeably, such a determination would not conclusively demonstrate that the

58

interchangeability included PCD, and, in any event: (1) the burden of production would outweigh any marginal relevance; and (2) the other evidence already produced (and to be produced, pursuant to this Order) is sufficient to show (or not show) this interchangeability. Determining who paid PCD's legal fees is directly relevant to the piercing claim, however, so the Court finds that the Place Entity Defendants must provide Plaintiff with documents pertaining to the payment of PCD's legal fees. Regarding the discovery of the use of shared employees, the Court concludes that the general ledger and general journal entries are sufficient for this purpose. *See* T215. For these reasons, the Place Entity Defendants **SHALL** provide to Plaintiff any documents indicating the entity that paid any legal fees on behalf of PCD pursuant to the arbitration proceeding (including post-judgment discovery) and these proceedings.

With respect to **Request No. 1** (requests for capital documents), Defendants alleged at the hearing that the documents had been produced, and Plaintiff asked for the numbers of the Bates-stamped documents. T215-16. Defendants **SHALL** provide to Plaintiff the numbers of the Bates-stamped documents that are responsive to Request No. 1.

For the reasons above, the Court **GRANTS IN PART AND DENIES IN PART** Plaintiff's third (labeled "second") motion to compel, [Doc. 266].

59

**E.    Plaintiff Manhattan's Motion to Compel Deposition Testimony from PP, [Doc. 312] (Response, [Doc. 355]; Reply, [Docs. 376 (redacted), 383 (unredacted)]; Supplemental Memoranda, [Docs. 483-484]; Response to Second Supplemental Memorandum, [Doc. 488])**

**1.    Introduction**

Manhattan requests that the Court compel PPLP to provide the following deposition testimony pursuant to FED. R. CIV. P. 30(b)(6):

| Topic No. | Defendant | Requested Documents |
|-----------|-----------|---------------------|
| 52 | PPLP | Any equity or control that you have with any other entity. |
| 55 | PPLP | The January 1, 2007 Facilities and Services Agreement ("Agreement"), and all payments, disbursements, expenses, reimbursements and invoices related to the Agreement as well as the time of, and the circumstances surrounding, the execution of the Agreement. |
| 74 | PPLP | All financial transactions of any type from 2003 to the present between you and/or Place Collegiate Development and the Other Defendants. |
| 75 | PPLP | All loans between Place Properties and Place Collegiate Development, and repayment of such loans. |

60

| 76 | PPLP | All loans to Place Collegiate Development from any person or entity, and repayment of such loans. |
|----|------|----------------------------------------------------------------------------------------------------|
| 84 | PPLP | Between 2005 and 2006, Place Collegiate Development's inter-company balance with Place Properties' change from a $16.5 million asset to a $15.2 million liability. |

[Doc. 319 at 13-15].

### 2. Timeliness

The timeliness of this motion is not in dispute.

### 3. Merits

#### a. Arguments of the Parties

Plaintiff generally argues that PPLP failed to comply with Rule 30(b)(6) by offering deponents who were not knowledgeable or unprepared to testify about the topics listed above. Plaintiff argues that the testimony provided was insufficient for purposes of the rule and, as a result, it is entitled answers on deposition about PPLP's equity or control over other entities, information regarding FSAs, financial transactions involving PPLP and PCD, and information on changes in PCD and PPLP's inter-company balances. [Doc. 319 at 13]. Plaintiff argues that it needs: (1) the

equity/control information to demonstrate how the corporate arrangement of the Place Entities was abused and used to siphon assets from PCD and make it judgment-proof; (2) the FSA information to demonstrate that the Place Entities commingled funds and that PCD paid for the Place Entities' shared expenses, without adequate consideration, after the judgment was entered; (3) the financial information to fully understand key transactions that contributed to PCD's insolvency and Defendants' exploitation of PCD's corporate form (specifically, Plaintiff alleges that it is entitled to information about Phillips's purported loans to PPLP and about the $410,000 that PCD received since the present lawsuit was filed and that was immediately pledged as collateral for a loan to PPLP); and (4) the inter-company balance information to fully explain the shift of PCD's $16.5 million receivable from PPLP to a $15.2 million liability between 2005 and 2006, while the underlying arbitration was pending. [*Id.* at 13-15].

PPLP countered generally at the December 2010 hearing that: (1) there were 122 noticed topics, and some of the topics were very broad; (2) the 30(b)(6) witnesses responded appropriately to the questions asked; and (3) any "I don't know" answers were appropriate because they were outside the ambit of the specification. *See* T217-18. As an example, PPLP noted that the $410,000 was not within the ambit of the specification because that money was not a transfer to PPLP but instead involved a

transfer to PCD followed by a pledge of collateral, and the pledge of collateral was not within the ambit of the specification. T218.

As to the specific requests, Topic No. 52 was mentioned only briefly at the December 2010 hearing. *See* T219. Plaintiff expressed the need to understand how PPLP controlled Place Incentive Student Housing Fund ("PISHF"), which apparently came about after the lawsuit was filed. *See* T225-26. In particular, Plaintiff requested an answer to the question: "Is PPLP a manager of Place Incentive Student Housing Fund, LLC?" T227 (referencing Doc. 312-1 at 7).

With respect to Topic No. 55, Defendants stated that it pertained to the 2007 FSA, and that a corporate representative may or may not have information as to why a particular entity did not become a party to the agreement. *See* T220.

With respect to Topic No. 74, regarding financial transactions, Defendants emphasized the scope of the request (which included all financial transactions from 2003 until 2010, the time the deposition was taken), presumably implying that it is unsurprising that the deponent (Bob Clark) could not recall the details of one particular transaction. *See* T221. Defendants stated that: (1) Clark was simply not involved in this pledge of collateral; (2) this involved a pledge of collateral rather than a financial transaction; and (3) in any event, Phillips testified on the subject, stating that he was

AO 72A
(Rev.8/8
2)

involved in pledging the collateral and provided a full explanation. *See* T221. Plaintiff disputed this last point, contending that Phillips's testimony merely flagged the $410,000 but did not explain who authorized it or why "this was done midstream during this." T222. Plaintiff argued that the fact that this money was not put to the benefit of PCD's creditors but instead was immediately pledged to PPLP is "just evidence of this intermingling." T223. Plaintiff also appeared to dispute PPLP's representation that Phillips was involved in the transaction, *see* T223, and PPLP conceded that Bunting was the witness who had testified about the transaction, T227.

With respect to Topic No. 75 (request for all loans between PPLP and PCD), PPLP stated that the questioning fell into three categories: (1) loans from Phillips to PPLP, which was not a specified topic; (2) loans between PCD and PPLP, but those had been produced in inter-company records containing around 4,000 transactions, which document was never shown to the witness, and it was unreasonable to require the witness to memorize more than 4,000 transactions; and (3) the reason why PPLP did not loan money to PCD to pay Manhattan's judgment – *i.e.*, loans that were not made – which is the beyond the scope of the specification. T227-29.

With respect to Topic No. 76 (request for all loans to PCD from any person or entity), Defendants reiterated that there were a large number of transactions and that Plaintiff could have shown a document to the deponent but did not. *See* T229.

With respect to Topic No. 84 (request for PCD's "inter-company balance with [PPLP's] change from a $16.5 million asset to a $15.2 million liability"), PPLP argued that the deposition testimony established that: (1) PCD's $9 million annual operating loss (which resulted in part from legal costs from the arbitration proceedings) caused PPLP to loan additional money to PCD; and (2) accounting reclassifications. T230. According to PPLP, the 30(b)(6) witness testified that he was aware of no other major factors that caused the shift. T230. It then argued that this constituted responsive testimony, particularly given that Manhattan had and had used elsewhere an inter-company ledger accounting detail showing the specific line items that resulted in the change in balance. T230.

Plaintiff generally replied that: (1) the witnesses did not request to see documents to help them testify; (2) in trying to save motions to compel, Plaintiff waited until the last deposition to cover these topics that had not been adequately covered before; (3) while Bunting was later brought back, she could not offer any more

65

information about the $410,000 because "nobody had investigated it and come prepared to explain it." *See* T231-32.

Following these presentations at the December 2010 hearing, the undersigned ordered the parties to file additional briefs within 14 days discussing the following: (1) a summary of the various deposition testimony about the $410,000; (2) Defendants were to explain what financial statements from 2006-2008 were available (which pertained to the first motion to compel, [Doc. 243], and was discussed above); (3) Plaintiff was to explain why the deposition answers were inadequate (with Defendants filing a single response within 7 days); and (4) submit a copy of Phillips and the PPLP 30(b)(6) depositions. *See* T232-33. The Court now turns to those supplemental filings.

### b.     Supplemental Filings Ordered by the Court

### i.  Plaintiff's Brief Concerning the $410,000

In Plaintiff's First Memorandum in Further Support of Its Motion to Compel Deposition Testimony, Plaintiff argued that (1) Phillips testified on June 23, 2010, that Provident Foundation owed a deferred development fee of $900,000 to PCD, and that that money was not paid (which Plaintiff claims was a false statement); (2) Bunting testified on July 6, 2010, that that same claim – PCD's claim for the $900,000

66

development fee from Provident Foundation – was settled for $410,000 just a few weeks *before* Phillips's deposition, money that was paid in May 2010; (3) Phillips must have known about this settlement because Bunting confirmed the information via a phone call to Phillips during a deposition break; (4) PPLP's designated witness, Clark, did not know anything about the $410,000 settlement at his deposition on July 7, 2010, even though the topic had come up the day before at Bunting's deposition and PPLP's attorneys were present. [Doc. 483 at 2-7]. Plaintiff contends that further information on the $410,000 is needed, specifically: (1) who authorized the transaction; (2) why the $410,000 was not applied to the benefit of PCD's creditors; and (3) why Phillips failed to mention the settlement when directly questioned about the settled claim. [*Id.* at 7]. Plaintiff further argues that it is entitled to question PPLP about other financial transactions between PCD and PPLP that Defendants may have failed to disclose. [*Id.*].

AO 72A
(Rev.8/8
2)

## ii. Defendants' Brief Concerning the $410,000[32]

In their Report Regarding Pledge of Certificate of Deposit ("CD"), Defendants initially note that Plaintiff did not inquire into the pledge of the CD until July 6, 2010 (after the close of discovery), during the 30(b)(6) depositions of PCD. [Doc. 485 at 2]. Defendants contend that: (1) Bunting testified to the amount of the CD, the ownership of the CD by PCD, the source of the funds of the CD, and the pledge of the CD for a loan to PPLP; (2) during other parts of the deposition, Plaintiff inquired about deferred development fees; (3) Bunting testified that the $900,000 did not qualify for being an account receivable because its collection was uncertain; (4) while Phillips explained the nature and terms of the $900,000 deferred development fee, Plaintiff made no inquiry regarding that negotiation, its results, or whether any amount had actually been paid to PCD, instead focusing on whether Phillips would be willing to make an assignment in favor of Manhattan; (5) although Bunting testified as a representative of PPLP on July 7, 2010, the day after she had given extensive testimony concerning the $410,000

---

[32]     Plaintiff moved to strike this filing on the grounds that it did not comply with the Court's order at the December 2010 hearing to file a short brief regarding the scope of testimony about the $410,000. [Doc. 489]. Plaintiff alleges that the Court directed *Manhattan* to file the brief, [Doc. 489 at 2]; Defendants respond that the order was for *both* parties to file a brief, [Doc. 492 at 2-3]; and Plaintiff's reply maintains that the order was directed at Plaintiff alone, [Doc. 494 at 2]. The Court intended each party to file such a brief and therefore **DENIES** Plaintiff's motion, [Doc. 489].

68

settlement on behalf of PCD, Plaintiff's counsel chose not to ask her at the July 7

deposition any additional questions regarding the CD, the deferred development fee in

question (relating to a University of Missouri, Kansas City ("UMKC") project), or the

loan for which the CD was pledged as collateral.  [*Id.* at 7-13].  Defendants further

contend that the only claim for which PCD's pledge of the CD is arguably relevant is

the veil-piercing claim by Manhattan against PPLP, but the deposition testimony on the

pledge of the CD was adequate for its relevance to this case, since Plaintiff knows

(1) the parties to the pledge, (2) when it was made, (3) the issuing bank, (4) the parties

to the loan for which the pledge was made, (5) the nature of the collateral pledged,

(6) the amount of the CD, (7) that the funds for the CD came from the settlement of a

deferred development fee with Provident regarding the UMKC project, (8) that the

project had not performed at the level specified in the contract, and (9) that there had

been a negotiation and settlement with Provident, the proceeds from which were used

to purchase the CD.  [*Id.* at 13-14].

69

AO 72A
(Rev.8/8
2)

### iii. Plaintiff's Brief Concerning the Inadequacy of the Deposition Testimony[33]

In its Second Memorandum, Plaintiff requests additional testimony on: (1)(a) the $410,000 settlement; (1)(b) financial transactions between PCD and Defendants (Topic Nos. 74-76); (2) Defendants' equity in or control of the Place entities, including the ownership and management structure of PISHF and Place Properties Student Housing Fund ("PPSHF") (Topic No. 52); (3) information underlying the 2007 and 2008 FSAs (Topic No. 55); and (4) PPLP's inter-company balance change with judgment-debtor PCD from a $16.5 million asset to a $15.2 million liability between 2005 and 2006

---

[33]    Plaintiff moved to strike PPLP's response to this filing as untimely. [Doc. 490]. Plaintiff contends that: (1) the Court ordered that Defendants were permitted to file a response to Manhattan's brief within 7 days; (2) Defendant PPLP's response was therefore due on January 19, 2011; and (3) no response was filed until January 24, 12 days after Plaintiff's filing. [*Id.* at 2]. In response, PPLP states that the filing was timely or, in the alternative, if untimely, the response should be stricken along with all of Plaintiff's untimely filings. [*Id.*]. PPLP states that: (1) on January 12, 2011, Plaintiff's supplemental memorandum was filed and served by ECF; (2) because the memorandum was served by ECF, a three-day period was added to the seven-day period specified by the Court, taking the response date to Saturday, January 22, which meant that the due date was extended to the following Monday, January 24. [*Id.* at 3-4].

The Court finds that the response was timely filed. Because the supplemental memorandum was filed electronically (pursuant to Rule 5(b)(2)(E)), three days were added to the seven days specified. *See* FED. R. CIV. P. 6(d). Because the tenth day was a Saturday, PPLP had until the following Monday to file its response. *See* FED. R. CIV. P. 6(a)(1)(C). As a result, the Court **DENIES** the motion to strike.

AO 72A
(Rev.8/8
2)

(Topic No. 84). [Doc. 484]. With respect to the $410,000 settlement, Plaintiff merely reiterates that it was entitled to all details and documentation surrounding the transaction. [*Id.* at 2-3]. With respect to "[o]ther [l]oans" between PCD and Defendants, Plaintiff noted that: (1) when asked about loans between PPLP and other Place entities, Clark – PPLP's 30(b)(6) designee – repeatedly answered, "I don't know"; and (2) when asked whether PPLP loaned money to PCD, Clark stated that he believed there were loans to PCD to fund PCD's "general working capital needs," but had no other details. [*Id.* at 3]. With respect to equity that Defendants have in other Place Entities, Plaintiff first states that Phillips testified that other entities – including PPDS – had undertaken the development of off-campus student housing because of claims against PCD, and Defendants have not adequately explained the ownership and function of each Place entity so that Manhattan may understand which entities now perform PCD's former functions and hold PCD's assets. [*Id.* at 3-4]. Plaintiff then argued that: (1) Defendants' expert report includes a chart showing that PISHF is owned by PPLP and Place Incentive Equity, LLC; (2) PISHF owns PPSHF, along with Blue Vista; (3) PPSHF is the "100% owner" of PMG, PPDS, Place Properties Development, LLC, and "other" LLCs that have taken over student housing; (4) Defendants' relative interests in PISHF and PPSHF are unknown; and (5) when

71

Clark was asked who appointed the managers of PISHF and whether PPLP exerted any control over PISHF's managers, he answered that he did not know. [*Id.* at 4-5]. With respect to the FSAs and shared expenses, Plaintiff contends only that PCD paid for the Place Entities' shared expenses, and information regarding the 2007 and 2008 FSAs is directly relevant to this point. [*Id.* at 5]. With respect to the inter-company balance information, Plaintiff argues that it is entitled to an explanation of why PCD's $16.5 million receivable from PPLP switched to a $15.2 million liability, because Clark's explanation for the loss – that it was caused by "too many expenses and not enough revenue" – was insufficient. [*See id.*].

In response, PPLP states that the deposition testimony was adequate. [Doc. 488]. It initially notes that while Manhattan previously stated that any production of documents ordered by the Court would not require recommencing discovery, Manhattan now states that any further production will result in a need to depose PPLP. [*Id.* at 2]. As to the pledge of the CD, PPLP states that: (1) it is not unusual that PCD would have pledged the CD because PPLP had been PCD's primary lender, having loaned more than $20 million to PCD since PCD began having financial difficulties; (2) Plaintiff improperly characterized Phillips' testimony, who actually testified that "the $900,000 has not been paid," rather than testifying that a "$900,000 claim" had not

72

been paid; (3) Plaintiff asked Bunting no questions about the pledge, although Plaintiff

knew that she was knowledgeable on the subject; and (4) Plaintiff's supplemental brief

does not claim any need to know anything further regarding the pledge, because it only

seeks information regarding the settlement, which does not fall within Topic 74

because PPLP was not a party to the settlement or the underlying agreement. [*Id.* at 3-4

& nn.2-3]. With respect to PPLP's equity in other entities, PPLP states that: (1)

Plaintiff's supplemental brief seeks broader information than the motion to compel

itself (which only addressed the identity of PISHF's managers and PMG's officers and

design construction department; (2) PISHF is not alleged to control or own PCD, so its

managers are irrelevant to piercing PCD's veil. [*Id.* at 4]. With respect to the 2007 and

2008 FSAs, PPLP states that: (1) the notice of deposition did not mention the 2008

FSA, so PPLP was not required to be prepared on that topic; (2) Plaintiff improperly

seeks information about FSAs from an entity (PPLP) that was not a party to the FSAs

and had no knowledge of why it was not a party; and (3) Plaintiff knew the reason why

PPLP was not a party to the FSAs: the accountant who arranged for the FSAs testified

that services to PPLP were "minimal" and insufficient to merit PPLP's inclusion in the

FSA, similar to certain companies in Manhattan's corporate family. [*Id.* at 4 n.4]. With

respect to inter-company balance changes between PPLP and PCD, PPLP states that:

73

(1) Plaintiff already knew details of the changes from a 116-page inter-company ledger of PPLP showing more than 4,000 line-item transactions from 2003-2009 (Deposition Exhibit 159); (2) PPLP testified to "major factors" regarding Topic 84; (3) PCD's operating loss is not within Topic 84, and in any event that should have been addressed to PCD rather than PPLP.  [*Id.* at 5].

### c.    Discussion

The Court finds that Plaintiff's motion to compel deposition testimony from PPLP should be granted in part and denied in part.

Regarding **Topic No. 52** (PPLP's control over other entities), the request is **DENIED**.  As PPLP notes, [Doc. 488 at 4], PISHF is not alleged to own or control PCD, so it is therefore irrelevant to piercing PCD's veil.  Further, to the extent Plaintiff believes the information obtained would buttress its claim that the Place Entity Defendants share expenses, pay bill interchangeably, etc., Plaintiff already has (or will receive, pursuant to this Order) information that is sufficient to support (or not support, as the case may be), this contention.  In addition, Plaintiff already appears to know that PPSHF (owned by PISHF and Blue Vista) is the "100% owner" of numerous LLCs, including some Defendants, [Doc. 484 at 4].

With respect to **Topic No. 55** (the January 2007 FSA and related documents), the request is **DENIED**.  It would not necessarily be unexpected that a 30(b)(6) witness would be unaware of why a particular entity was not a party to a particular agreement, and in any event there was testimony explaining why PPLP was not a party to the 2007 FSA.  [Doc. 488 at 4 n.4 (citing Bunting's 06/21/2010 deposition); Doc. 488-3 at 5 (excerpt of Bunting's deposition)].

With respect to **Topic No. 74** (all financial transactions between PPLP and PCD and the other Defendants), the Court finds that the request should be **GRANTED** for the limited purpose of discovering: (1) why the pledge for the $410,000 was not applied to the benefit of PCD's creditors; and (2) who authorized the transactions.  While Defendants are correct that Plaintiff knows a number of details regarding the transaction, [Doc. 485 at 13-14], the most relevant information to the piercing claim – who made the decision to make the pledge, and why it was made – are still unclear. Plaintiff is therefore entitled to depose an informed 30(b)(6) witness for the limited purpose of making a reasonable inquiry into the two topics named above.

Regarding **Topic Nos. 75-76** (respectively, all loans between PPLP and PCD, and all loans to PCD from any entity), the requests are **DENIED**.  As Defendants explained, T228-29, it is unreasonable to expect a witness to know the details of so

AO 72A
(Rev.8/8
2)

many transactions without having a document to reference, a document that Plaintiff had but did not provide the witness. For this reason, the Court will not order further deposition testimony on these topics.

Regarding **Topic No. 84** (inter-company balance information between PCD and PPLP), the request is **DENIED**. While the change in balance is striking, the Court does not believe that a sufficient showing has been made that the deposition testimony was inadequate, particularly in light of Plaintiff's possession of the inter-company ledger for the relevant time period detailing several thousand transactions. It is not apparent that the information provided in that ledger is insufficient to explain operating losses. Further, Clark was testifying for PPLP, not PCD. Finally, Clark's answer (that the loss was caused by "[t]oo many expenses and not enough revenue"), while quite vague and unhelpful to Plaintiff, was not obviously insufficient under these particular circumstances. To assume otherwise would be to assume the truth of Plaintiff's argument: namely, that there was a nefarious purpose behind PCD's substantial losses (*i.e.*, with a purpose of avoiding PCD having to pay the judgment). The Court will not assume that fact, especially since Plaintiff has access to documents concerning many transactions between PCD and PPLP, and yet Plaintiff apparently does not feel that they help its claim.

76

AO 72A
(Rev.8/8
2)

**F.      Attorney's Fees**

If a motion to compel is granted and denied in part, "the court . . . may, after giving an opportunity to be heard, apportion the reasonable expenses for the motion." FED. R. CIV. P. 37(a)(5)(C).  Unlike the other provisions of the rule (with respect to motions that are granted or denied in their entirety), this provision is permissive, not mandatory.  *See* FED. R. CIV. P. 37(a)(5).  Because there are no circumstances that suggest to the Court that an award of attorney's fees is warranted, the Court declines to award such fees.  Further, although one motion to compel was denied, which would normally mandate the Court to require Plaintiff to pay PCD's attorney's fees, FED. R. CIV. P. 37(a)(5)(B), the Court declines to do so because the motion was substantially justified, *see id.*  Although the Court does not find the requests meritorious, this had more to do with the duplicative and excessively broad nature of the requests rather than a particular lack of relevance.

**II.      Conclusion**

For the reasons above, the Court **GRANTS IN PART AND DENIES IN PART** Plaintiff's first motion to compel, [Doc. 243], **DENIES** Plaintiff's motion to compel discovery from PCD, [Doc. 252], **GRANTS IN PART AND DENIES IN PART** Plaintiff's "second" (actually third) motion to compel, [Doc. 266], and **GRANTS IN**

77

**PART AND DENIES IN PART** Plaintiff's fourth motion to compel, [Doc. 312].

Further, the Court **DENIES** Plaintiff's two motions to strike. [Docs. 490, 492].

Defendants **SHALL** provide the written documents ordered produced pursuant to this Order within **fourteen days** of the entry of this Order. Further, the renewed deposition of a PPLP Rule 30(b)(6) witness solely on the topics permitted pursuant to Section I.E.3.c. above **SHALL** be held no later than **twenty-eight days** of the entry of this Order.

The Clerk **SHALL** terminate the referral of this matter to the undersigned.

**IT IS SO ORDERED and DIRECTED**, this the 10th day of May, 2011.

_____
**ALAN J. BAVERMAN**
**UNITED STATES MAGISTRATE JUDGE**

AO 72A
(Rev.8/8
2)